UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: SACV 13-160-JLS (RNBx) Date: August 27, 2014
Title: Vizio Inc. v. Gemtek Technology Co. Ltd. et al.

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

| Terry Guerrero | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| Not Present | Not Present |

**PROCEEDINGS: (IN CHAMBERS) ORDER ON MOTIONS IN LIMINE**

Before the Court are nine motions in limine: four filed by Plaintiff and Counter Defendant Vizio, Inc., and five filed by Defendant and Counter Plaintiff Gemtek Technology Co., Ltd. The Court addresses each in turn.

## I. Background

Vizio, a California corporation, sells consumer electronic devices. (Second Amended Complaint, Doc. 71, ¶ 6.) Gemtek, a Taiwanese corporation, manufactures consumer electronic devices. (Id. ¶ 7.) Vizio and Gemtek entered into a binding Supply Agreement whereby Gemtek would manufacture and supply Vizio with electronic products. (Id. ¶ 1.) Among the products Gemtek supplied to Vizio were wireless HDMI devices ("wHDMI devices"), which wirelessly transmit video and audio signals. (Id. ¶ 2.) Vizio ultimately recalled and returned to Gemtek more than 15,000 wHDMI devices as defective because they failed to transmit an audio signal – in other words, they produced a picture but no sound. (Id.) Vizio then demanded a refund under the Supply Agreement but Gemtek did not refund Vizio. (Id. ¶¶ 3-4.) As a result, Vizio is pursuing

a breach of contract claim against Gemtek.[1] (Doc. 71.)

On February 20, 2013, Gemtek filed a counterclaim against Vizio, alleging Vizio breached the same contract by failing to pay Gemtek for the wHDMI devices. (Answer and Counterclaim, Doc. 12, ¶¶ 7-8.) Gemtek further alleges Vizio has failed to pay for wireless routers and Skype cameras provided under the Supply Agreement. (Id.)

## II. Vizio's Motions in Limine

Motion in Limine #1

In its first Motion in Limine, Vizio requests an order precluding Gemtek from introducing evidence that components made by a third-party, SiBeam, Inc., caused the defect in the wHDMI devices.[2] (Mot., Doc. 105, 1:1-4.)

Vizio asserts that this evidence is irrelevant because under the Supply Agreement, Gemtek assumed all responsibility for product quality.[3] (Mot. 3:9-11, 4:22-23) Gemtek notes that under the Supply Agreement, its warranty against defects does not apply "where such defects are due to the . . . unique nature of the materials designated or required by Vizio," and alleges that Vizio required it to use SiBEAM materials – specifically, "Reference Architecture" – which in turn caused the "no audio" issue in the wHDMI devices. (Opp. 4:20-27, 4:10-11.) Vizio, in reply, argues that it never required

---

[1] The operative Second Amended Complaint also asserts a claim for breach of the implied covenant of good faith and fair dealing. (Doc. 71.) On July 31, 2014, this Court dismissed that claim with prejudice. (Doc. 111.)

[2] Gemtek previously moved for leave to file a third-party complaint against SiBEAM in this case. (Doc. 56.) The Court denied the Motion because it was untimely under the Scheduling Order in this case and Gemtek lacked "good cause" to modify the Scheduling Order. (Doc. 65.)

[3] Vizio also argues that this evidence will confuse the jury and cause it to improperly apportion liability. Because this is a Court trial, however, this concern is misplaced.

Gemtek to use SiBEAM's Reference Architecture, only SiBEAM's physical chipsets. (Reply, Doc. 142, 1:9-12.)

Here, neither party disputes the meaning of the above contractual provision. Rather, they dispute whether Vizio *in fact* required Gemtek to use SiBEAM's Reference Architecture, such that the provision applies. On this point, the evidence Gemtek seeks to introduce is highly relevant. Because the Motion essentially asks the Court to adopt Vizio's version of this disputed factual issue, the resolution of which would be potentially dispositive as to the wHDMI devices, this Motion is really a "disguised motion for summary judgment" and inappropriate for resolution as a motion in limine. *See Dunn ex rel. Albery v. State Farm Mut. Auto. Ins. Co.*, 264 F.R.D. 266, 275 (E.D. Mich. 2009).

Vizio's First Motion in Limine is therefore DENIED.

Motion in Limine #2

In its second Motion in Limine, Vizio seeks an order precluding Gemtek from introducing evidence of three categories of damages it says Gemtek cannot recover under the Supply Agreement: (1) leftover products; (2) leftover components; and (3) credits for returned goods. The Court will consider each category in turn.

a. Leftover Products

Vizio argues that Gemtek is contractually precluded from recovering damages for leftover products – products Gemtek manufactured but did not ship to Vizio. (Mot., Doc. 106, 3:14-25.) Vizio argues that under the Supply Agreement, it is obligated to purchase manufactured products only if it submitted a purchase order, and that while it has the option of purchasing leftover products, it is not obligated to do so. (Mot. 3:27-4:4, 4:7-4:25, 5:1-5:6.)

Gemtek argues that the parties' course of performance demonstrates that they abandoned the purchase order protocol and instead used Vizio's sales forecasts as *de facto* purchase orders, and that this course of performance validly supplements or

modifies the Supply Agreement's terms. (Opp., Doc. 119, 3:21-23.) It also argues that under Section 14.2 of the Supply Agreement, it is entitled to recover for products that were "in the pipeline" – that is, finished but unshipped. (Opp., 3:3-10.)

*Course of Performance*

The California Commercial Code does not permit the parties' course of performance to supplement or modify the Supply Agreement's terms.

Section 1303 of the California Commercial Code requires courts interpreting a contract to construe the express terms and any applicable course of performance together when they are reasonably consistent with each other. Cal. Com. Code § 1303(e). However, where express terms and course of performance are *not* reasonably consistent with each other, "express terms prevail over course of performance." Cal. Com. Code § 1303(e)(1). Here, the requirement that Vizio purchase goods only via a highly detailed purchase order protocol[4] is not reasonably consistent with the notion that Vizio's "good faith rolling forecast[s]" could also be used as purchase orders.[5] If the forecasts were *themselves* purchase orders, as Gemtek claims, the contract's very detailed provisions regarding purchase orders would become surplusage. Moreover, numerous important provisions of the Supply Agreement become meaningless without the use of purchase orders, again rendering large swaths of the agreement surplusage under Gemtek's

[4] The Supply Agreement requires that purchase orders contain the following: product identification and short description; quantity; price per unit; ship-to address; "In-Hub" date; special packaging and shipping requirements; address to which invoices shall be sent; and any additional terms. (Supply Agreement, ¶ 2.3.)

[5] The Supply Agreement required Vizio to provide Gemtek with weekly, good-faith forecasts of its demands for the next 120 days. (Supply Agreement, ¶ 2.2) A subsequent purchase order would be deemed accepted if, among other things, the quantity requested fell within the forecast, plus or minus 20%. (Id. ¶ 2.4(a)). Otherwise, a purchase order would not be immediately binding. (Id.).

reading. Even the foundational term "Products," for instance, is defined as items "specified in a Purchase Order by Vizio." (Id. ¶ 1.20.)

Gemtek is correct that course of performance is ordinarily relevant in determining whether the parties have waived or modified any contractual term that is inconsistent with their performance. Cal Com. Code § 1303(f). However, this is not the case where the parties' signed agreement excludes modification except by a signed writing, as the Supply Agreement does. (Supply Agreement, ¶ 16.4.). *See* Cal. Com. Code § 2209(2).

Because the Supply Agreement's provisions concerning purchase orders may not be supplemented or modified by the parties' course of performance, Gemtek cannot recover for leftover product where it did not receive a purchase order.

*Product in the Pipeline*

Gemtek alternately argues it can recover damages for leftover product for which it did not receive a purchase order because it was "in the pipeline."

Section 14.2 provides that after an uncured material breach, Gemtek may "resell the Product whether *in the pipeline* or shipped to Supplier's hub . . . and . . . charge Vizio for any costs and expenses incurred therefrom including the difference between the resale price and the price of the Purchase Order." (Supply Agreement, ¶ 14.2.) (emphasis added). The plain language of this clause contemplates the previous submission of a purchase order, as does the term "Product," which is expressly defined as a "networking router and/or related products, any related accessories, and all other such products *as may be specified in a Purchase Order* by Vizio from time to time in writing to Supplier . . . ." (Id. ¶ 1.20.) (emphasis added). Gemtek's interpretation of the words "in the pipeline" is at odds with Section 14.2's plain language as well as the Supply Agreement as a whole. S*ee* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

Therefore, Gemtek cannot recover for leftover product that was "in the pipeline" where it did not receive a purchase order for those specific items.

In sum, Vizio's Second Motion in Limine is GRANTED IN PART as to leftover

products. As a matter of law, Gemtek cannot recover for leftover product where it did not receive a purchase order pursuant to the Supply Agreement. Neither the parties' course of performance nor any item's status as "in the pipeline" can overcome the plain meaning of the Supply Agreement. The Motion is DENIED IN PART. Gemtek is entitled to seek damages for "leftover product" where it received a purchase order and the Supply Agreement's requirements are otherwise met.

b. Leftover Components

Vizio next argues that Gemtek is contractually precluded from recovering damages for leftover components – components Gemtek paid for in connection with manufacturing products to Vizio under the Supply Agreement. (Mot. 5:8-14.)

Vizio argues that under Section 2.6 of the Supply Agreement, Vizio is liable for leftover components only if it submitted a purchase order for which those components were ordered. (Mot. 6:17-21.) In opposition, Gemtek argues that Section 14.2 of the Supply Agreement permits Gemtek to require Vizio to "buy back the unique Components and pay the costs and expenses incurred for such unique components" following an uncured material breach by Vizio. (Opp. 6:19-7:3.) Gemtek implicitly acknowledges that the Supply Agreement's text suggests this applies only where there has been a purchase order, but again argues that the parties' course of dealing indicates otherwise. (Opp. 6:2-18.)

Here, too, the Supply Agreement does not favor Gemtek's position. Section 14.2 provides: "[I]n the event of an uncured material breach by Vizio that exists for more than thirty (30) days, [Gemtek] may at it sole discretion . . . require Vizio to buy back the Unique Components and pay the costs and expenses incurred for such Unique Components." (Supply Agreement, ¶ 14.2.) However, the Supply Agreement elsewhere specifically defines "Unique Components" as "components ordered by [Gemtek] *based on a Purchase Order received from Vizio* that are unique to the Product(s) [and] cannot be returned or cannot be utilized for products of [Gemtek's] other customers." (Id. ¶ 2.6.) (emphasis added).

Gemtek again argues that the parties' course of performance establishes that its forecasts operated as purchase orders, and that it therefore can recover for components purchased based on the forecasts, but for the reasons noted previously, this is not a permissible construction of the Supply Agreement.

Accordingly, Vizio's Second Motion in Limine is GRANTED IN PART as to leftover components. The Supply Agreement does not permit Gemtek's recovery for leftover components except where Vizio submitted a purchase order for items for which the components were purchased. The Motion is also DENIED IN PART. Gemtek can recover damages for leftover components where Vizio submitted a purchase order for items for which the components were purchased and the Supply Agreement's requirements are otherwise met.

c. Returned Goods

Vizio finally argues that Gemtek is contractually precluded from recovering damages for credits Vizio claimed for returned goods. (Mot. 7:14-8:12.)

Vizio argues that it is entitled to the credits under the Supply Agreement because it returned the products to Gemtek and Gemtek did not repair and return or replace them within 14 days. (Mot. 8:3-12.) Gemtek argues that Vizio is not entitled to credit for returned routers and Skype cameras because they were not returned under the Warranty Claim Procedure and that Vizio is not entitled to a credit for returned wHDMI devices because their defect was caused by SiBEAM material Vizio required it to use.

As to the wHDMI devices, this Motion parallels Vizio's First Motion in Limine: Vizio essentially requests that the Court enter summary judgment in its favor, since Gemtek could be precluded from damages here only if the fault did *not* arise from SiBEAM materials Vizio required Gemtek to use. However, this is a disputed factual issue, not an evidentiary question suitable for disposition through a motion in limine.

The routers and Skype cameras stand on a different footing because there appears to be no allegation that they are defective. Again, however, a factual dispute exists precluding resolution of this question through a motion in limine. Whether Vizio

returned the Skype cameras and routers pursuant to the Warranty Claim Procedure or some other protocol is a disputed factual question. Therefore this, too, is a "disguised motion for summary judgment," because the Court can only grant the Motion if it first finds as fact that Vizio returned the items pursuant to the Warranty Claim Procedure. *See Dunn*, 264 F.R.D. at 275.

For these reasons, Vizio's Second Motion in Limine is DENIED as to returned goods. Whether Vizio was entitled to withhold credit for the wHDMI devices under the Supply Agreement depends on the Court's factual findings about the source of their flaws. Whether Vizio was entitled to withhold credit for the routers and Skype cameras similarly depends on the Court's determination of whether the devices were returned under the Warranty Claim Procedure or some other protocol.

Motion in Limine #3

In its third Motion in Limine, Vizio asks the Court to preclude Gemtek from claiming Vizio was responsible for testing the defective wHDMI devices.

Vizio argues that the Supply Agreement makes Gemtek solely responsible for testing the wHDMI devices. (Mot., Doc. 107, 3:12-14.) Gemtek denies this and argues that the parties' course of dealing can properly supplement the Supply Agreement. (Opp., Doc. 122, 4:23-26.)

Though the parties point to various areas of the agreement in support of their respective positions, the most relevant portion of the contract reads:

> Article 6: Quality Assurance, Regulatory Compliance, and Open Source Software
>
> 6.1. Quality.
>
> Product quality is one of the foundational elements of Vizio's value position to its customers and end-users. As such, Vizio and [Gemtek] shall work in good faith throughout the terms of this agreement to ensure adherence to Vizio's quality philosophy. [Gemtek] will follow

> the quality assurance procedures, conduct the quality assurance testing and provide Vizio with quality assurance reports as agreed from time to time between Vizio and [Gemtek]."

(Supply Agreement, ¶ 6.1.)

The Court does not find that this provision makes Gemtek solely responsible for product testing. Although it indicates that Gemtek will conduct "the quality assurance testing" required by "Vizio's quality philosophy," it contains no language that Gemtek is "solely" responsible for all testing of any kind. Indeed, the preceding sentence establishes that Vizio and Gemtek "shall work in good faith throughout the . . . Agreement" to ensure product quality, implying that they will do so together. Because the language does not establish that Gemtek is solely responsible for product testing, it is possible to harmonize the Supply Agreement's express terms with the parties' course of dealing, which the Court must do whenever possible. *See* Cal Com. Code § 1303(e) (" . . . [T]he express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade *must* be construed whenever reasonable as consistent with each other.") (emphasis added). And here, the parties' course of dealing shows their understanding that they would work together to address product defects as they arose.[6]

Vizio's Third Motion in Limine is therefore DENIED.

Motion in Limine #4

In its fourth Motion in Limine, Vizio seeks to preclude Gemtek from introducing any evidence or witnesses not previously disclosed during discovery. (Mot., Doc. 108.)

Vizio correctly notes that the Federal Rules of Civil Procedure limit parties' use at

[6] Gemtek cites numerous emails in which Vizio requested that Gemtek send products to Vizio "for review and testing," as well as evidence that Vizio, Gemtek and SiBEAM worked collaboratively to test devices at SiBEAM's facility because Gemtek lacked appropriate testing resources. (Opp., 5:25-7:7.)

trial of witnesses and documents not disclosed during pre-trial discovery. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless.") However, as Gemtek notes in its opposition, Vizio does not identify any category or item of evidence it believes Gemtek will attempt to present at trial in violation of the Rules. (Opp., Doc. 120, 1:17-19.) The Court will not grant a motion in limine that fails to identify with specificity the evidence to be excluded and reason for exclusion, *see, e.g.*, *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996), because granting such a motion "would do no more than restate the requirements of the federal rules." *Brown v. Gutierrez*, C03-1141 TEH, 2006 WL 3065574 (N.D. Cal. Oct. 27, 2006).

Therefore, Vizio's Fourth Motion in Limine DENIED. The Court declines to issue an order merely restating the Federal Rules of Evidence. Vizio may object to the introduction of any evidence not disclosed by Gemtek during discovery if and when Gemtek seeks to admit such evidence at trial.

## III. Gemtek's Motions in Limine

Motion in Limine #1

In its first Motion in Limine, Gemtek seeks an order excluding Vizio's putative expert, Dr. Stephen A. Edwards, from testifying at trial.

Whether expert testimony is admissible is determined under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training,

> or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Through *Daubert* and its progeny, the Supreme Court has made clear that Rule 702 imposes a "gatekeeping" obligation on the district court to ensure that proposed expert testimony is relevant *and* reliable. *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000). "*Daubert*'s 'general holding – setting forth the trial judge's general gatekeeping obligation – applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *United States v. Alatorre*, 222 F.3d 1098, 1101 (9th Cir. 2000) (citations omitted). "The test for reliability is flexible and depends on the discipline involved." *Wagner v. Cnty. of Maricopa*, 673 F.3d 977, 982 (9th Cir. 2012). Where, as here, the expert's opinions are based not on scientific knowledge, but rather on "specialized knowledge" acquired through relevant professional experience, "Rule 702 generally is construed liberally." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). The *Daubert* factors "simply are not applicable to [non-scientific ] testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotation marks omitted). Finally, "[a] trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis*, 657 F.3d at 982 (citing *Kumho Tire*, 526 U.S. at 152.)

Here, Gemtek argues Edwards fails to qualify as an expert witness because his testimony: (1) is not based upon sufficient facts or data; (2) is not the product of reliable principles and methods; and (3) does not apply reliable principles and methods reliably to the facts of the case. (Mot., Doc. 99, ii:9-12.) Gemtek argues Edwards lacks sufficient

data to testify about the reason for the wHDMI devices' audio failure because he admits he never tested the devices' underlying source code. (Mot. 3:14-4:8.) Gemtek argues that Edwards' testimony is also not the product of reliable principles and methods because, by his own admission, he is not an expert in software testing. (Mot. 6:2-8.)

In Opposition, Vizio denies Edwards will identify a specific defect in the source code that caused the audio failure and says "any suggestion" that he will is a "mischaracterization of his report and testimony."[7] (Opp., 1:18-19, 7:7-14.) Rather, Vizio says Edwards will testify on three issues: (1) standards of care commonly followed in the software development industry; (2) Gemtek's failure to comply with these standards; and (3) how failure to comply with these standards of care can lead to poor final products. (Opp. 3:20-4:4.) Vizio asserts that Edwards' extensive academic and professional experience in this area – including a doctorate degree in in Electrical Engineering, current employment as a tenured professor of Computer Science at Columbia University, professional experience as a senior research and development software engineer in Silicon Valley and more than 80 publications in the Computer Science field – qualifies him as an expert as to this subject. (Opp. 4:8-14; *see also* Litigation Support Curriculum Vitae, Doc. 118, Ex. A, at 17.)

The crux of Gemtek's Motion is that Edwards has not tested the wHDMI devices or their underlying source code and admits he is not an expert on source code testing.[8] (Mot. 6:1-9.) Therefore, Gemtek argues, he cannot credibly opine as to the cause of the audio failure. However, Vizio asserts that Edwards will not discuss any specific flaw in

---

[7] Vizio also argues at some length that this Motion is untimely under the Court's current Scheduling Order which requiring *Daubert* motions to be brought within seven days of the close of expert discovery. (Mot. 2:3-6.) However, the Scheduling Order issued in this case, in January 2013, does not so provide. (Doc. 27.)

[8] The parties debate whether Gemtek improperly failed to produce the source code during discovery, thereby preventing Edwards from testing it. (Opp., 7:7-14; Reply, Doc. 136, 8:21-9:8.) In any case, his admission that he is not an expert in source code testing likely would foreclose his testimony on that topic.

the source code, but will instead focus on best practices in the software development industry, Gemtek's alleged deviation from them and the potential consequences of doing so. (See Opp. 5:7-12.) The Court finds Edwards is qualified to testify as an expert on these topics. *See* Doc. 118, Ex. A. Moreover, Edwards' expert report demonstrates that he considered a wide range of relevant data concerning Gemtek's compliance with software development industry standards. *See id.*, ¶¶ 24-30, 32-33, 37-39 (discussing Gemtek's chosen software language and its pitfalls, techniques to mitigate the risk of bugs that Gemtek failed to follow, evidence that Gemtek lacked environmental consistency, evidence that Gemtek's testing procedures were based on an inadequately small sample size and indications that Gemtek failed to follow its own testing procedures).

Accordingly, Gemtek's First Motion in Limine is GRANTED IN PART. Vizio disclaims any intent to have Edwards testify about specific flaws in the underlying source code. Therefore, the Motion is granted as to this testimony. Gemtek's First Motion in Limine is DENIED IN PART. Edwards is qualified to testify about the ordinary standard of care in the software development industry, Gemtek's failure to comply with this standard of care and the potential results of deviating from it.

Motion in Limine #2

In its second Motion in Limine, Gemtek seeks an order barring Vizio's putative expert, Dr. Jeff Drobman, from testifying at trial.

Gemtek specifically seeks to prevent Drobman from testifying that Gemtek should have mitigated its damages (1) by repurposing more "common parts" for its other products, (2) returning or selling to brokers those "unique parts" that could not be repurposed and (3) selling more routers than it did. (Mot., Doc. 100, 1:24-2:2.) Gemtek argues that Drobman is not qualified to testify as an expert on these matters because his educational and professional background in computer science is not relevant to the pricing and resale of electronic components at issue in this case. (Mot. 3:10-18.) Gemtek also argues that Drobman lacks sufficient facts as to Gemtek's ability to return open parts

to its suppliers or resell them on the open market. (Mot. 5:19-20, 6:5-23.)

In Opposition, Vizio argues that Drobman's experience of more than 35 years in the hardware industry "necessarily includes considerable involvement with components used in hardware development," and that "[h]is expertise in and familiarity with components and their involvement in the hardware development industry is of primary importance to understanding what constitutes reasonable steps taken in disposing of components." (Opp., Doc. 114, 3:15-19.) [9]

While Drobman's "experience of over 35 years in the hardware industry" is not in doubt, his report and supporting materials demonstrate that he has worked primarily in technical positions in the computer science field, and Vizio has not shown that he has any experience relevant to returning or reselling unique hardware components. (Doc. 104, Ex. H, 108:23-109:3, pp. 114-117.) Vizio's contention that Drobman's experience in the hardware industry "necessarily" equips him with an understanding of "what constitutes reasonable steps taken in disposing of components" is conclusory and otherwise unsupported. (Opp. 3:9-19.) Drobman indicates in his Expert Report that he has experience in "all facets of marketing," but fails to explain how experience in marketing equips him to opine as to the secondary market for hardware components or routers. (Ex. H, p. 115.) Indeed, in his deposition, Drobman disclaims any involvement with purchasing or selling components in his prior position. (Reply, Doc. 137, 5:20-13.) Tellingly, much of Vizio's argument about Drobman's fitness to testify revolves around (1) the incorrect contention that this Motion is untimely and (2) the perceived unfairness of excluding Drobman while Gemtek's experts may suffer from the same infirmities.

For these reasons, Vizio has not met its burden of demonstrating Drobman's expertise as to Gemtek's failure to mitigate by returning or reselling "unique parts" that could not be repurposed or by selling more routers than it did. However, Drobman's

[9] Vizio again argues at length that Gemtek's Motion is untimely, and that if this Motion is considered untimely, Vizio should be permitted to bring its own "untimely" *Daubert* motions as to Gemtek's experts. (Opp., Doc. 114, 2:10-15.) For the reasons previously noted, however, this assertion is incorrect.

substantial experience working with computer hardware appears to give him a substantial base of knowledge and experience to opine whether Gemtek could have mitigated its damages by repurposing more "common parts" for its other products.

Therefore, Gemtek's Second Motion in Limine is GRANTED IN PART. Drobman may not testify about Gemtek's failure to mitigate by returning or reselling "unique parts" that could not be repurposed or selling more routers than it did. The Motion is DENIED IN PART. Drobman may testify about whether Gemtek could have mitigated damages by repurposing common parts for other projects.

Motion in Limine #3

In its third Motion in Limine, Gemtek seeks an order barring the introduction of evidence that it used "pirated, stolen, or unlicensed" software.

This Motion arises out of Gemtek's use of a software development program called "IAR" to implement some of the Reference Architecture alleged by Vizio to have caused the "no audio" issue on the wHDMI devices. (Mot., Doc. 101, 1:14-21). Gemtek did not obtain a license to use that software. (Id.) Gemtek argues this evidence is irrelevant to the breach of contract question and that "any mention of the use of pirated, stolen, or unlicensed IAR software is unfairly prejudicial and creates an undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." (Mot. 4:16-18.). Vizio argues that IAR is a "complicated" piece of software with hundreds of settings and options, and that by failing to purchase it, Gemtek was ineligible to receive training or support from the manufacturer as to its use. (Opp., Doc. 115, 3:1-5.) Vizio argues that this evidence is also relevant to showing Gemtek's failure to conform to the industry standard of care. (Opp. 3:21-25.) Finally, Vizio asserts that the use of IAR constitutes a breach of a provision in the contract itself requiring Gemtek to obtain all licenses necessary for the manufacturer of Vizio products. (Opp. 4:7-20.).

Vizio has the better argument. This evidence is relevant to whether Gemtek provided a defective product. The risk of prejudice is minimal in light of the fact that this is a Court trial.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**



Gemtek's Third Motion in Limine is therefore DENIED.

Motion in Limine #4

In its fourth Motion in Limine, Gemtek seeks an order excluding evidence that Gemtek's conduct violated ISO 9001.

ISO 9001 is a series of standards, developed and published by the International Organization for Standardization (ISO), that specify requirements for a quality management system for manufacturing and service industries, including "assurance of conformity to customer and applicable statutory and regulatory requirements." (*See, e.g.*, Doc. 82, Ex. C.) Gemtek argues ISO 9001's standards are irrelevant because the Supply Agreement prescribes its own quality control measures. (Mot., Doc. 102, 2:13-19.) Vizio argues that Gemtek admitted that ISO 9001 governed production of the products at issue here in a previous Motion to Dismiss. (Opp., Doc. 116, 1:27-9.)

Any argument that the Supply Agreement required Gemtek to conform to ISO 9001 standards appears to be foreclosed by the law of the case. *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("Under the 'law of the case' doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.") (internal citations omitted). Here, the Court already found the Supply Agreement was not governed by ISO 9001:

> The Agreement requires in part that Gemtek "adhere[] to VIZIO's quality philosophy," follow "quality assurance procedures," and conduct "quality assurance testing." (Agreement at¶ 6.1.) The Agreement does not specifically require compliance with ISO 9001; this is a new obligation VIZIO seeks to impose based on "representations" made outside the Agreement. (Opp. at 6; SAC ¶ 14.) However, the Agreement contains an integration clause, (Agreement ¶ 16.15), and VIZIO fails to explain adequately why the Court should disregard the clause and read in new obligations.

(Order Dismissing Vizio's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing With Prejudice, Doc. 111, p. 3.) Nor did Gemtek admit that ISO 9001 governed the Supply Agreement in its Motion.[10] Accordingly, testimony as to whether Gemtek fell below the standards of ISO 9001 is irrelevant to this case.

Gemtek's Fourth Motion in Limine is GRANTED.

Motion in Limine #5

In its fifth Motion in Limine, Gemtek moves to exclude evidence of its work with a Vizio competitor, Monster.

Vizio seeks to introduce evidence that Gemtek and SiBEAM worked together to develop a device for Monster similar to the wHDMI device. (Mot., Doc. 103, 1:25-2:2.) Vizio seeks to introduce testimony from Gemtek's lead software engineer that the Vizio and Monster projects simultaneously used the same software code, that changes made for the Monster project would affect the Vizio project, that Gemtek had two separate teams working on these separate projects and that neither team communicated to determine how their changes on the common source code would affect the other project.[11] (Opp. 2:8-13, 2:20-3:3.) Vizio argues that this evidence is relevant to show that Gemtek caused the "no

[10] Indeed, Gemtek actually argued that ISO 9001 was superfluous given the Supply Agreement's own quality control measures. *See* Doc. 82, 8:11-17 ("[T]he terms to which the parties agreed consisted of compliance with Vizio's quality requirements, along with regulatory and statutory quality requirements. Those terms involve the same subject matter as ISO 9001. . . . [T]o the extent that Gemtec's alleged failure to comply with the ISO 9001 standard is based on substantive duties beyond the terms of the Agreement, it is invalid.").

[11] Gemtek disputes that its engineer actually testified to this in his deposition. (Rep., Doc. 140, 2:7-22.) However, Gemtek relies on a particular reading of his words; Vizo's interpretation of his deposition testimony appears to have at least as much support.

audio" issue, thus breaching the contract. (Opp. 3:4-7.) Gemtek admits that the Vizio and Monster projects utilized the same SiBEAM chipset technology, but says the host software was different for the Monster project and that this evidence is irrelevant. (Mot. 2:3-7.) It also argues this evidence is overly prejudicial. (Mot. 3:9-4:9.)

Vizio has the better argument. If believed, this testimony is relevant to Vizio's contention that Gemtek supplied it with a defective product in violation of the Supply Agreement. Because this is a Court trial, moreover, the danger of juror prejudice is substantially lessened.

Vizio argues in its Opposition that the Monster project is relevant for another purpose – that Gemtek was "working hard not to lose the Monster project" at the same time the "no audio" issue in this case arose and that "a reasonable inference exists that Gemtek was diverting resources from Vizio to the Monster project in order to not lose that business." (Opp. 3:17-20.) Gemtek notes in reply that evidence on this point is thin. (Reply, Doc. 140, 3:8-10.) Nevertheless, this is a rational inference that could be drawn from this evidence if adequately supported at trial, and Gemtek's objections primarily go to its weight and sufficiency, not to its admissibility.

Therefore, Gemtek's Fifth Motion in Limine is DENIED.

Initials of Preparer: _______