1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                 **CENTRAL DISTRICT OF CALIFORNIA**

10

11  VIZIO INC.,                          CASE NO. SACV 13-160-JLS (RNBx)

12         Plaintiff and Counter-
           Defendant,
13                                       **FINDINGS OF FACT AND**
                                         **CONCLUSIONS OF LAW**
14         vs.

15

16  GEMTEK TECHNOLOGY CO. LTD.,

17         Defendant and Counter-
           Claimant.
18

19

20

21

22

23

24

25

26

27

28

I.      **INTRODUCTION**

Following a three-day bench trial in this matter, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.  To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

II.     **FINDINGS OF FACT**

    A.      **Background**

1.  Plaintiff and Counter-defendant Vizio, Inc. and Defendant and Counter-claimant Gemtek Technology Company, Ltd. entered into a contract pursuant to which Gemtek would manufacture the following devices for Vizio: a wireless router; a Skype camera; and a wireless HDMI device.

2.  The parties' contract is known as the Supply Agreement and governs their respective rights and obligations as to the manufacture of these devices.  (*See generally* Supply Agreement.)

3.  Gemtek manufactured two different versions of the wireless HDMI device for Vizio, Mass Production 1 ("MP1") and Mass Production 2 ("MP2").  (Tr. 51-52.)

4.  MP1 preceded MP2.  (Tr. 51:25-52:3.)

5.  Vizio planned to sell the MP2 version through Costco.  (Tr. 52:16-18.)

6.  The MP2 version suffered from numerous defects.

    a.  Most notable was the "no audio" issue.  The MP2 version transmitted video but not audio from DirecTV set top boxes, Dish Network set top boxes, Tivo Premiere set top boxes, and PlayStation 3s in 3D mode.  (TR 334:23-336:10.)

    b.  In addition, 30% failed to turn on via remote control, 5% failed to turn on at all, and 100% had a remote-control range that was less than the product

specification required.  (Exs. 131-132; Tr. 113:20-114:19, 112:22-113:25, 114:16-19.)

7.   As a result of these defects, Costco recalled the MP2 version; more than 90 percent were returned to Costco.  (Tr. 53:9-11, 272:12-273:10.)

8.   Gemtek issued Return Merchandise Authorizations for 14,247 HDMI devices. (Stipulated Fact No. 6.)

9.   Vizio returned at least 12,487 HDMI devices to Gemtek.  (Stipulated Fact No. 5.)

### B.   Manufacturer's Warranty

10.  Article 7 of the Supply Agreement delineates Gemtek's duties as to product quality.  It provides in relevant part:

> 7.1.   Manufacturer's Warranty.  Except for any written warranties or guaranties expressly provided herein, Supplier provides no other implied, oral, written or express warranties.  Supplier warrants to VIZIO that:
>
>> (a)   During the Warranty Period relating to such Product, the Products shall conform to the applicable Specifications and shall be free from defects in materials, workmanship and design when shipped, except where such defects are due to unique nature of the design or unique nature of the materials designated or required by VIZIO and Supplier will take reasonable steps to provide VlZlO with advance written notice about any potential defect (for the avoidance of any doubt, this exception shall not apply to commoditized products e.g. if VIZIO requires or designates a particular LCD module or panel);
>>
>> (b)   All services performed by Supplier with respect to such Products will be performed in a workmanlike manner in accordance with good commercial practices; . . .

3

(Supply Agreement 7.1.)

11. Gemtek shipped the MP2 devices to Vizio and thereby warranted that they conformed to the applicable specifications and were free of defects in materials, workmanship, and design.  (Supply Agreement 7.1, 7.2.)

12. The "no audio" issue was a defect within the meaning of the Supply Agreement.

13. The Manufacturer's Warranty provides, however, that Gemtek is not responsible for a product defect that is caused by the "unique nature of the design or unique nature of the materials designated or required by VIZIO."  (Supply Agreement 7.1(a).)

14. A "Designated Part" is any "unique component(s), part(s), material(s) or software which VIZIO has specifically required Supplier to obtain and use in one or more Product(s).  For the avoidance of any doubt, Designated Part shall not include any commoditized components, parts, materials or software except and to the extent of a characteristic that is unique to VIZIO."  (Supply Agreement 1.5.)

15. Two documents set forth the required components, parts, material and software of the MP2 devices: the Hardware Specification and the Software Specification. (Hardware Specification, Ex. 8; Software Specification, Ex. 78.)

16. The Hardware Specification requires the use of four chips made by a third party, SiBeam.  (Hardware Specification.)

17. The SiBeam chips were available on the open market and used by numerous other electronics manufacturers in their products.  (Ex. 602; Ex. 1692 at 27-28; Tr. 55:10-20.)

18. Accordingly, the SiBeam chips are "commoditized" parts under the Supply Agreement.  (Tr. 271:4-22.)

   a. This result does not change because SiBeam held the chips out as technologically unrivaled, as their availability on the open market precludes any argument that they were not commoditized.  (*See* Gemtek's Proposed

Finding of Fact and Conclusions of Law ¶¶ 40-41; Ex. 602-2.)  Moreover, the Court discounts statements to this effect as puffery given that (1) they appeared in marketing materials and (2) Gemtek did not rebut testimony that at least one other company produced similar chipsets with similar functionality.  (Tr. 65:5-66:5.)

    b. Nor does testimony that the SiBeam chips were essential to the HDMI devices' operation change this result.  (Gemtek's Proposed Findings of Fact and Conclusions of Law ¶ 43.)  Again, the chips' availability on the open market precludes the argument that they were not "commoditized" under the Supply Agreement.  The SiBeam chips' importance to the HDMI devices' function is a separate and unrelated inquiry.

19. The Software Specification does not require the use of SiBeam's Reference Kit or Software Development Kit.  (*See generally* Software Specification.)

20. Nor did Vizio otherwise designate the use of SiBeam's Reference Kit or Software Development Kit.  (*See* Gemtek's Proposed Findings of Fact and Conclusions of Law ¶¶ 18-39, 46.)

    a. The "Non-Binding Memorandum of Understanding" between Vizio and SiBeam mentions only the use of SiBeam chipsets, not its Reference Kit or Software Development Kit.  (Non-Binding MOU, Ex. 704.)  Moreover, this document's import is limited, given that it facially states it is "not a legally binding agreement" and "does not constitute a binding agreement in any respect."  (Id. at 2.)  Indeed, in addition to the wireless HDMI devices, the MOU also sets forth plans for a product that was never made.

    b. The "Vizio WirelessHD Adapter XWH200 Product Schedule" and "WirelessHD Product Update" dated April 20, 2010 merely reflect that the wireless HDMI devices *used* SiBeam software, not that Vizio designated it. (*See generally* Exs. 7B, 626.)

c. Nor does the testimony of Frank Hung establish that Vizio knew that the SiBeam chips required the software provided in the Software Development Kit.  (*See* Gemtek's Proposed Findings of Fact and Conclusions of Law ¶ 60.)  While Hung acknowledged that SiBeam chips' "embedded code" was required to make them work, he also testified that Gemtek had "freedom to modify" or "change" the host code "to make sure that they can deliver . . . the product."  (Tr. 350:5-12; 361:2-8.)

21. Because the SiBeam chips are commoditized products and Vizio did not require the use of SiBeam reference kit or Software Development Kit, they were not designated or required by Vizio within the meaning of the Supply Agreement's exculpatory provision.  (*See generally* id.; *see also* Tr. 56:4-6.)

## C. <u>Warranty Claim Procedure</u>

22. Article 7.2 of the Supply Agreement sets forth the procedure under which Vizio was to return faulty devices to Gemtek.  It reads:

> 7.2. <u>Warranty Claim Procedure</u>
>
> (a) Defects in Products, end-user documentation and manuals, or packaging are the responsibility of Supplier during the Product Warranty period.  Shipment of Products by Supplier to VIZIO shall constitute a certification by Supplier that the Products comply with the Product warranties in Section 7.1 (the "**Product Warranty**").  Products that do not meet the Product Warranty will not be released for shipment by Supplier.
>
> (b) VIZIO shall have the right, at any time during the Warranty Period, to return to Supplier any Products which do not conform to the Product Warranty and require that Supplier, at VIZIO's option and Supplier's expense, (i) repair or replace such Products with new or

refurbished conforming Products or (ii) when defects exceed VIZIO's quality level (of which Supplier had prior written notice) refund the amounts paid by VIZIO for such non-conforming Products including any duties and other associated costs for that item. All claims that a Product does not conform with the Product Warranty ("**Warranty Claims**") shall be made in writing indicating the nonconforming characteristics of the Products.  Supplier agrees to repair Products to meet original factory Specifications at no charge within the Warranty Period.  Except for excluded claims falling within Section 7.7, within fourteen (14) days from the time any Products in breach of the Product Warranty are returned to Supplier (as shown on the Proof of Delivery), Supplier shall have used all reasonable commercial efforts to have completed the repair or replacement and shall have returned, at Supplier's cost, such repaired or replaced Procuctsto [sic] the location designated by VIZIO.  Supplier shall bear the expense and risk of loss in returning Products to Supplier (including warehousing, insurance and transport costs), the labor costs associated with removal of the Product and delivery of the repaired or replaced Product. Repair by Supplier shall include cleaning the unit and returning the unit in a new carton.

(c)      If after fourteen (14) days (including transit time) from receipt by Supplier, the unit is not repaired and returned or replaced, Supplier will, at VIZIO's request, credit VIZIO the price paid by VIZIO, including any duties and other associated costs for that item.

(d)      Products returned by VIZIO for repair or replacement that are determined by Supplier not to be in breach of the Product Warranty after appropriate inspection or testing, will be referred to as "No

Defect Found" returns ("**NDF**"). NDF units shall be the responsibility of Supplier except that if the NDF rate in any calendar year exceeds ten percent (10%) of the total Products sold through to VIZIO's customers, VIZIO shall be responsible for the excess over the ten percent (10%) for the applicable calendar year. The determination of NDF test requirements will be agreed upon between VIZIO and Supplier prior to launch of each Product. Supplier will refurbish an NDF product only at VIZIO's request.

. . .

7.4. <u>Dispute</u>. If Supplier disputes a Warranty Claim, the Parties shall attempt to resolve such dispute as quickly as possible, and if they are not able to resolve the dispute within forty five (45) days following receipt of such claim by VIZIO, the dispute shall be escalated to appropriate executive officers of each Party for resolution. Notwithstanding the foregoing, both Parties shall work in good faith throughout any dispute to ensure that warranty and service obligations are met so that the dispute does not adversely impact VIZIO's customers, end-users or reputation of the Product in the marketplace.

7.5. <u>Refunds and Credits</u>. If payment has already been made for a valid Warranty Claim, then within five (5) Business Days after validation of a Claim by mutual agreement for which VIZIO has elected to receive a refund under Section 7.2(b) or is entitled to a refund under Section 7.2(c), Supplier shall, at VIZIO's option, provide VIZIO with (x) a refund of the full amount paid by VIZIO for such Products, including duties and other associated costs or (y) a credit against future billings equal to the full amount so paid for such Products.

(Supply Agreement 7.2, 7.4-7.5.)

23. Gemtek issued "Return Merchandise Authorizations" to Vizio for 14,247 HDMI devices.  (Stipulated Fact No. 6.)

24. Vizio returned 12,487 HDMI devices to Gemtek.  (Stipulated Fact No. 5.)

25. Under Articles 7.2 and 7.4 of the Supply Agreement, Gemtek had 14 days to repair and return, replace, or dispute a warranty return.  Otherwise, Gemtek was obligated to credit Vizio with the price paid for the returned item upon Vizio's request.  (Supply Agreement 7.2, 7.4; Tr. 187:22-188:25.)

26. Gemtek did not repair and return, replace, or dispute the returned HDMI devices within 14 days.  (Tr. 187:22-188:25; Depo. of Tiger Wu, Doc. 191, 41:8-42:8.)

27. Accordingly, under the Warranty Claim Procedure, Gemtek is obligated to credit Vizio with the price Vizio paid for the returned devices.  (Supply Agreement 7.2(c).)

28. Gemtek has not done so.

29. Gemtek argues the devices were not returned under the Warranty Claim Procedure and that the Return Merchandise Authorizations therefore have "no legal significance."  (See Rebuttal Trial Brief at 9.)  Instead, Gemtek argues it "agreed to take the products back for contemplated repair" and "assumed that Vizio would take back the adapters after Gemtek refurbished them . . . ." (Id.)  This alleged understanding between the parties, however, appears nowhere in the Supply Agreement, which specifically states that it "represents the entire agreement and understanding of the Parties regarding the subject matter hereof" and "may only be amended or modified in writing, signed by the duly authorized representative of each of the Parties."  (Supply Agreement 16.4 16.15.)  Thus, Gemtek is precluded from arguing that the parties informally modified the Supply Agreement by implementing an alternative return system.  (*See* Order on Motions in Limine, Doc. 170, at 5; Cal. Com. Code § 2209(2).)  Instead, the devices were returned pursuant to the Warranty Claim Procedure.

# III.    CONCLUSIONS OF LAW

30.  The elements of a claim for breach of contract are: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to the plaintiff."  *Wall St. Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008) (citing *Regan Roofing Co. v. Superior Court*, 24 Cal. App. 4th 425, 434-35 (1994)).

31.  Vizio and Gemtek entered into a valid contract, the Supply Agreement.

32.  Vizio performed its obligations under the Supply Agreement.

33.  Gemtek materially and substantially breached its obligations under the Supply Agreement by failing to refund Vizio for the 12,487 HDMI devices returned pursuant to the Warranty Claim Procedure.[1]

34.  Vizio was damaged as a result of Gemtek's breach.

35.  Specifically, Vizio paid Gemtek $147 for each HDMI device it received. (Stipulated Fact No. 4.)  Vizio returned 12,487 HDMI devices returned pursuant to the Warranty Claim Procedure.  Thus, under the Warranty Claim Procedure, Gemtek owes Vizio $1,835,589 for 12,487 HDMI devices returned by Vizio to Gemtek.

## A.    Offset for Prior Credits to Vizio by Gemtek

36.  Gemtek argues Vizio's damages should be reduced by $229,614 because Vizio received a credit from Gemtek in this amount for some returned HDMI devices. (Gemtek's Proposed Findings of Fact and Conclusions of Law ¶ 214; Gemtek's Supplemental Trial Brief at 9.)

37.  The sole evidence Gemtek cites in support of this claim is the following testimony

---

[1]  Because Gemtek breached its obligations under the Supply Agreement, its breach of contract counterclaim fails.

of Kurtis Binder, Vizio's Chief Financial Officer:

○ Q:    Vizio received $229,000 of returned credits for return of HDMI adapters, correct?

○ A:    That is my understanding.

(Tr. 281:24-282:1; *see* Gemtek's Proposed Findings of Fact and Conclusions of Law ¶ 214.)

38. This testimony is insufficient to establish Gemtek's entitlement to this offset. First, as a matter of evidence, Binder's testimony that his "understanding" is that Vizio received $229,000 in credits for returned adapters does not, without more, prove this fact by a preponderance of the evidence, particularly where Gemtek seeks a *different amount* than Binder testified to.[2]

39. Moreover, Gemtek argues Vizio took this credit "against its outstanding accounts receivable to Gemtek . . . under the Return for Credit procedure." (Gemtek's Proposed Findings of Fact and Conclusions of Law ¶ 214.) Binder testified, however, that the HDMI devices subject to this credit were not returned pursuant to the Return for Credit procedure. (Tr. 280:24-281:9.) Thus, this testimony does not demonstrate that the Return for Credit procedure's provisions apply.

40. Finally, Gemtek argues it should receive this credit "because the warranty issue was due to SiBeam's unique component." As discussed above, however, the SiBeam components were not "unique" within the meaning of the Supply Agreement's exculpatory provision. (Findings of Fact ¶ 21.)

41. Accordingly, Gemtek has not demonstrated its entitlement to the $229,614 offset.

---

[2] While the difference between $229,000 and $229,614 is not great, it is nevertheless notable that, on the evidence before the Court, Gemtek appears to have pulled the figure of $229,614 out of thin air.

**B.**   **Stipulated Damages Owed by Vizio to Gemtek**

42.   The parties have stipulated that Vizio owes Gemtek $759,002.50, consisting of the following:

   o   $8,526 in outstanding invoices for HDMI devices (Stipulated Fact No. 1)

   o   $455,687.50 for wireless routers (Stipulated Fact No. 1);

   o   $256,068 for Skype cameras (Stipulated Fact No. 1); and

   o   $38,721 for "short pays."  (Stipulated Fact No. 2.)

43.   Accordingly, Gemtek is entitled to a $759,002.50 setoff against Vizio's damages.

**C.**   **Gemtek's Damages for Open Purchase Orders and Component Parts on Hand**

44.   Gemtek next seeks $160,000 in damages for open purchase orders and component parts on hand.  (Gemtek's Proposed Findings of Fact and Conclusions of Law ¶ 213.)

45.   In support of this claim, Gemtek cites only the following testimony of Gemtek account manager Roxanne Hsiao:

> Q:   What is your understanding of the current amount of money that Gemtek has paid vendors in connection with purchasing parts that it purchased in connection to make the Vizio products?
>
> . . .
>
> A:   Are you asking about the open [purchase orders] or components?
>
> Q.   For the open purchase orders that Gemtek has with its vendors in connection with the purchase of products for Vizio?
>
> A:   Roughly 160K.
>
> (Tr. 163:7-20; *see* Gemtek's Proposed Findings of Fact and Conclusions of Law ¶ 213.)

46.   Hsiao's testimony concerns "open purchase orders that *Gemtek* has with *its*

vendors." (Tr. 163:7-20) (emphasis added).  The Court has previously found, however, that under the Supply Agreement, Gemtek may recover for leftover components only where Vizio submitted a purchase order for which Gemtek purchased the components.  (Order on Motions in Limine at 6-7.)  Hsiao's testimony does not establish that Vizio issued purchase orders to Gemtek for which Gemtek purchased $160,000 in component parts.  It establishes only that Gemtek purchased these parts "in connection with the purchase of products for Vizio."  Thus, Hsiao's testimony fails to establish a basic prerequisite to these damages.

47.  Accordingly, Gemtek has not demonstrated its entitlement to $160,000 in damages for open purchase orders with its vendors and component parts on hand.

### D.    Gemtek's Offset for Rebates Received by Vizio from SiBeam

48.  Gemtek finally argues Vizio's damages should be offset by $244,389.60, the amount in rebates Vizio received from SiBeam in connection with Gemtek's purchase of SiBeam chips for the HDMI devices.  (*See* Gemtek's Proposed Findings of Fact and Conclusions of Law ¶¶ 39, 210.)  Gemtek argues that as a result of this rebate, "Vizio's costs for the adapter product were reduced by the SiBeam rebate," and absent an offset, Vizio will receive "both what it paid to Gemtek . . . and what it got as a rebate from SiBeam . . . ."  (Gemtek's Rebuttal Trial Brief at 10.)

49.  First, the Supply Agreement contains no provision permitting offsets of this type.  Rather, the Supply Agreement simply provides that in the event of an uncured return of a defective device, Vizio would receive the amount paid to Gemtek for such device.  The parties stipulated that Vizio paid Gemtek $147 for each HDMI device.  (Stipulated Fact No. 4.)  Thus, the Supply Agreement on its face provides no reason to offset Vizio's damages based on its independent contractual

1    arrangement with SiBeam.

2    50.   Moreover, even if the Supply Agreement provided for an offset in this

3          circumstance, Gemtek has nevertheless failed to establish that the rebate actually

4          took place.  It cites to the following testimony of Binder:

5          Q.    And if you look to the first page [of Exhibit 750], it references a

6                $244,000 rebate that SiBEAM was going to send to Vizio.  Do you see that?

7          A.    Yes. It was never mailed, yes.

8          Q.    And do you have any reason to dispute that Vizio eventually received

9                the $244,000 rebate from SiBEAM in connection with Gemtek's purchase of

10               chipsets used on the adapter product?

11         A.    No basis to dispute.

12               (Tr. 287:8-16; *see* Gemtek's Proposed Findings of Fact and Conclusions of

13               Law ¶¶ 39, 210.)

14   51.   This testimony at most establishes that Binder, after having asserted that the rebate

15         was "never mailed," had *no reason to dispute* that Vizio took a $244,000 rebate.

16         (Id.)  Nor does Exhibit 750 – which Binder discussed – establish that a rebate was

17         received.  Rather, it shows SiBeam's request for additional documentation for

18         Vizio to provide before the rebate would be sent – an event Binder asserted

19         without contradiction never occurred.  (Ex. 750-10.)

20   52.   Thus, Gemtek has failed to establish that (1) the rebate between Vizio and SiBeam

21         actually occurred or (2) that it is entitled to an offset in that circumstance.

22

23         **E.    <u>Interest</u>**

24   53.   Vizio is entitled to recover interest on its damages at a rate of 10 percent per

25         annum.  Cal. Civ. Code §§ 3287(a), 3289.

26

27

28

1   **IV.    CONCLUSION**

2          For the foregoing reasons, Vizio is entitled to $1,076,586.50 in damages on its

3   breach of contract claim plus statutory interest.

4          Vizio shall submit a proposed judgment forthwith.

5

6

7

8   DATED:  April 22, 2015        _____

9                                 JOSEPHINE L. STATON
                                  UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28